IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

LOWE'S HIW INC.,                          )
                                         )
            Plaintiff,                    )    TC-MD 130067C (Control)
                                         )            130068C
                                         )
      v.                                  )
                                         )
LINN COUNTY ASSESSOR,                     )
                                         )
            Defendant.                    )    **FINAL DECISION**

The court entered its Decision in the above-entitled matter on January 13, 2014. The

court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14

days after its Decision was entered. The court's Final Decision incorporates its Decision without

change.

## I. INTRODUCTION

Plaintiff has appealed the real market value of its large regional distribution warehouse,

including the machinery and equipment, for the 2012-13 tax year. The subject property is

identified in the assessor's office as Accounts 169678 and 940881.

Trial in the matter was held in Salem on September 11, 12, and 16, 2013. [1] Plaintiff was

represented by Christopher K. Robinson, Attorney at Law. Defendant was represented by Bruce

H. Cahn, Attorney at Law. Plaintiff's Exhibits 1 through 7, 9 and 10 were admitted into

evidence. Defendant's Exhibits A through K, L through U, W, and AA were admitted into

evidence.

/ / /

---

[1] The first two days of trial (Sept. 11 and 12 ) were held in Salem. The parties presented testimony and documentary evidence regarding the value of the buildings and structures. Trial reconvened by telephone on September 16, 2013, to hear testimony on the value of the machinery and equipment.

Testifying for Plaintiff was Jeff Grose (Grose), Executive Managing Director, Colliers International Valuation & Advisory Services, Oregon licensed appraiser, and MAI. (Ptf's Ex 1 at 1, 3, 51.) At trial, Grose spoke to the value of the subject property buildings and structures. Plaintiff submitted an appraisal report prepared by Grose. (Ptf's Ex 1.) Also testifying for Plaintiff was Matthew D. Kaufman (Kaufman), President, Spearhead Valuation Group, LLC, Accredited Senior Appraiser (ASA).[2] (Ptf's Ex 2 at 3, 8, 9, 17.) Kaufman testified as to the value of the subject property machinery and equipment. Plaintiff submitted an appraisal report prepared by Kaufman. (Ptf's Ex 2.)

Testifying for Defendant was Gene Johnston (Johnston), Appraiser, Linn County Assessor. Johnston, who testified he had been employed by Defendant for 25 years, spoke to the value of the subject property buildings and structures under the cost approach. Defendant submitted a collection of exhibits depicting the subject property and Johnston's cost valuation estimate. (Def's Exs A-O.) Also testifying for Defendant was Robert M. Greene (Greene), President, G&A Valuation, Inc., Oregon licensed appraiser, MAI, SRA, and PhD. (Def's Ex U at 3, 54.) Greene spoke to the value of the subject property buildings and structures. Defendant submitted an appraisal report prepared by Greene. (Def's Ex U.) Defendant's third and final witness was Raymond A. Springer (Springer), President, Springer Appraisal & Consulting, LLC, ASA. (Def's Ex W at 2-3.) Springer specializes in the valuation of machinery and equipment. (*Id*. at 25.) Springer testified to the value of the machinery and equipment within the subject property building and structures and submitted a written appraisal report. (Def's Ex W.)

/ / /

/ / /

---

[2] The ASA accreditation is given by the American Society of Appraisers. (Ptf's Ex 2 at 17.)

## II. PRELIMINARY MATTERS

The day before trial, Plaintiff filed a Motion In Limine (Motion) requesting that the court exclude eight pages (38 to 45) of Defendant's Exhibit U "and any other references therein to a sales comparison approach and any testimony thereon * * *." (Ptf's Mot at 2.) The basis for Plaintiff's Motion was Defendant's omission of two pages of that exhibit. (*Id*. at 1.) Defendant filed a written Response To Motion In Limine (Response), requesting that the court deny the motion because the omission was inadvertent and Defendant provided Plaintiff's counsel with the missing pages within eight *minutes* after Plaintiff made Defendant aware of the situation. (Def's Resp at 2) (Emphasis added). The court considered the Motion and Response and, after hearing briefly from the parties on the morning of the first day of trial, denied the Motion.[3]

Additionally, on the morning of trial, the parties submitted to the court a written document titled Stipulated Facts which included 13 factual stipulations. The court received the parties' Stipulated Facts; key among those factual stipulations was the real market value of the subject property land, which the parties agreed was $6,601,200 for the tax year at issue.[4] (Stip Facts at 1, ¶ 2.) That left at issue only the value of the buildings and structures, machinery and equipment, and some personal property.

/ / /

/ / /

/ / /

---

[3] The disputed exhibit was one of Defendant's appraisal reports - a key component of its case. Only two pages were missing from the copy of the report Defendant provided Plaintiff and the court. The omission was inadvertent and was cured immediately upon notification from Plaintiff. Plaintiff had an opportunity to review the two missing pages prior to the commencement of trial. Plaintiff's counsel was given an opportunity to further review the document and discuss the matter with his appraisal witnesses before the author of that report (one of Defendant's appraisers) testified, and raise an objection, if he felt such objection was warranted.

[4] The parties' agreement to the $6,601,200 land real market value simply mirrors the value placed on the rolls by Defendant as it appears on the original 2012-13 property tax statement for Account 169678, meaning Plaintiff elected to not challenge that value and Defendant concurred. (*See* Ptf's Compl at 5.)

## III. STATEMENT OF FACTS

A.     *General overview*

The subject property is a large distribution warehouse serving 85 Lowes home improvement center stores in five western states including Oregon. (Stip Facts at 1, ¶ 5; Ptf's Ex 1 at 5.) The warehouse was built by Plaintiff, the owner/occupier of the property, in 2006 and 2007, and has substantial machinery and equipment inside. (Stip Facts at 1, ¶ 1; Ptf's Ex 1 at 2, 10.) It is located in Lebanon, Oregon, a small town located several miles east of Oregon's major north-south interstate freeway (Interstate-5), as described in more detail below. (Ptf's Ex 1 at 2, 5; Def's Ex U at 14.)

The parties agree that the 85 different Lowes home improvement stores served by the subject warehouse are located as follows: 13 in Oregon, 36 in Washington, 30 in California, one in Idaho, and five in Alaska. (Stip Facts at 1, ¶ 5.)

Plaintiff obtained a building permit for the construction of the warehouse in May 2006. (Def's Ex N at 41.) Permit approval was for the construction of a total of 1,541,650 square feet of buildings with a stated estimated value of the work to be performed of $77,991,663 (rounded), which comes to $50.60 per square-foot (rounded). (*Id*.)

B.     *Area demographics*

Lebanon is a small town of approximately 15,000 people, located in Oregon's central Willamette Valley, approximately eight miles east of Interstate-5, the main north-south corridor through Oregon. (Ptf's Ex 1 at 14, 21; Def's Ex U at 15.) According to the parties' appraisers, Lebanon is between 70 and 83 miles south of Portland, Oregon, which is the largest city in the state and 45 miles north of the city of Eugene, another major city in Oregon that is also located in the Willamette Valley along Interstate-5. (Ptf's Ex 1 at 15; Def's Ex U at 9.) The appraisers

provide slightly different area demographics for the town, with Grose focusing on commercial and industrial development in the area as well as housing and schools, while Greene began his economic analysis with an overview of the area's principal industries with a list of major local employers. (Ptf's Ex 1 at 15-16; Def's Ex U at 11-12.) Grose reports that "[m]ajor retailers [in Lebanon] include Wal-Mart and Safeway, as well as three car dealerships[,] Ford, Chrysler, and Chevy," noting that "Lebanon was the site for the first Wal-Mart in the State of Oregon[,]" and that the "original [Wal-Mart] store has since been replaced by an 188,000 SF Wal-Mart Super Center." (Ptf's Ex 1 at 16.) The appraisers do agree that the timber and wood products industries were the principal industries in the area for many years. (Ptf's Ex 1 at 16; Def's Ex U at 9.) Greene further notes in his report that the economy has historically relied heavily on "agriculture, mining, and manufacturing[,]" and that "Linn County is also home to the only emery mine in the United States[.]" (Def's Ex U at 9.)

C. *The subject property*

The warehouse structure is approximately 1.43 million square feet in size and includes slightly more than 20,000 square feet of office space and slightly more than 21,000 square feet of space devoted to maintenance rooms. (Ptf's Ex 1 at 5, 22 and 23; Def's Ex U at 2.) The main warehouse is constructed on a reinforced concrete foundation with tilt up concrete exterior walls, masonry structural framing, and a "steel truss [roof] with metal decking and [a] flat membrane roof cover[.]" (Ptf's Ex 1 at 23; *see* Def's Ex U at 21.) The heating and cooling system consists of a number of "roof mounted forced air HVAC units serving the office areas[,] [and] gas-fired radiant heat in the warehouse[.]"[5] (Ptf's Ex 1 at 23; *see* Def's Ex U at 21.) The ceiling height in

/ / /

---

[5] The term "HVAC" is an abbreviation commonly used in the industry for heating, ventilation, and air conditioning.

the main part of the warehouse is 40 feet high, which, according to the parties, is typical for mega warehouse facilities. (Def's Ex U at 35.)[6]

The warehouse property has considerable machinery and equipment, but the appraisers agree that the main items are an extensive conveyor and electronic sorting system that is several linear miles in length, and a large integrated racking system for the storage of items received and subsequently shipped to and from the subject distribution warehouse. (Ptf's Ex 2 at 9; Def's Ex W at 15, 28-29.)

The parties agreed at trial, and the pictures submitted by Plaintiff and Defendant corroborate, that the warehouse is maintained in excellent condition. (*See* Ptf's Ex 1 at 7-8; Def's Ex U at 23-26.) One of Defendant's witnesses testified that while he was doing a site visit of the property as part of his appraisal preparation, he was surprised at how well the building was kept up, and that the Lowes employee assisting with his tour of the warehouse would even stop periodically to pick items up off the floor and discard them in a trash can. The photographs depict a well constructed warehouse maintained in immaculate condition. (*Id.*)

The warehouse building includes a "lunch room with [a] full commercial kitchen, perimeter fencing, [some] ancillary buildings * * * and abundant truck and employee [auto] parking." (Ptf's Ex 1 at 22.) Grose reports 662 employee parking spaces and 1,078 truck parking spaces. (Ptf's Ex 1 at 5.) There is also a small one passenger elevator servicing the office area, and two guard houses, one for the office and visitor parking lot and the other for the truck entrance. (Def's Ex U at 21.) Additional buildings on the property include a concrete block visitor center/gatehouse, a concrete block transportation center/gatehouse, a canopied

---

[6] Although Grose's appraisal reports the ceiling height to be 36 feet, Grose acknowledged at trial that he had made a mistake in his report, and that the ceiling was actually 40 feet, a matter that garnered much discussion during direct and cross examination. (Ptf's Ex 1 at 22.) Defendant's appraisal report, Exhibit U, correctly indicates at page 35 that the ceiling height is 40 feet.

transportation center, a 375,000-gallon concrete water tank, and a "concrete block pump house

containing 1,015 square feet of gross building area." (Def's Ex U at 35.)

The building sits on approximately 150 acres of land, located some 6.5 miles east of

Interstate-5. (Ptf's Ex 1 at 21; Def's Ex U at 14.) The warehouse has approximately 225 dock-

high loading doors and two grade-level overhead doors, as well as 660 parking spaces. (Ptf's Ex

1 at 22; Def's Ex U at 21.)

There is conflicting evidence on actual construction costs. Grose reports that costs

provided by the client were $53,443,662. (Ptf's Ex 1 at 47.) However, the Oregon Enterprise

Zone Exemption claim form Plaintiff filed with the assessor in March 2008 reports a cost of

$67,814,597 for the newly constructed buildings and structures, and an additional $18,573,108

for machinery and equipment.[7] (Def's Ex AA at 1-2.) Grose did note in his report, and testified

at trial, that the costs reported to him by Plaintiff only included "hard costs," and that an

additional ten percent, or $5,344,366, should be added for "soft costs."[8] (Ptf's Ex 1 at 47.)

Adding Grose's soft costs to the owner's reported hard costs comes to a total of $58,788,028. As

Defendant pointed out during cross examination of Grose, the difference is slightly more than $9

million ($9,026,569). Plaintiff attempted to minimize the importance of the gap between the two

---

[7] Oregon provides for a property tax exemption - defined by the legislature as an enterprise zone exemption - for certain qualifying property for up to three years pursuant to ORS 285C.045 to ORS 285C.260. The urban enterprise zone sponsor is allowed by statute "to impose additional conditions on eligible business firms seeking [exemption] under ORS 285C.140. ORS 285C.150. There is no evidence in this case as to whether the subject property was completely exempt or had certain "additional conditions" imposed upon it requiring the payment of money to the zone sponsor. Such information, however, is not pertinent to the issue before the court, as it has no bearing on the real market value of the subject property.

[8] The terms "soft costs" and "indirect costs" are used interchangeably by the appraisal industry. Plaintiff submitted a "Valuation Glossary" as part of Grose's appraisal report for the subject building and structures. That document defines "indirect costs" in part as follows: "items other than labor and materials that are necessary for construction, but are not typically part of the construction contract. Indirect costs may include administrative costs; professional fees; financing costs and the interest paid on construction loans; taxes and the builder's or developer's all-risk insurance during construction." (Ptf's Ex 1 at 64.) Those items were described during trial by the appraisal witnesses as including items such as design and architectural fees, permit fees, etc.

numbers by eliciting testimony from Grose on redirect concerning his replacement cost new estimate using the Marshall valuation service figures; Grose's replacement cost new estimate is $65,542,479, a difference of "only about $2 million."[9]

The parties have stipulated that "[t]he [subject] property was built in 2006-2007 [and that] [t]he certificate of occupancy was issued in 2007. (Stip Facts at 1, ¶ 1.) The parties also agree that the facility sits on a 152.97 acre parcel that is zoned for industrial development (Z-Ind), and had a land real market value for the 2012-13 tax year of $6,601,200, which is the value on the assessment and tax rolls for 2012-13. (*Id.* at 1, ¶ 2-4.) They further agree that "[t]here have been no significant replacements or upgrades documented since the original construction of the property[]" in 2006-2007. (Stip Facts at 2, ¶ 10.)

There are two assessor accounts for the subject property, one for the buildings and structures (Account 169678) and another for the machinery and equipment (Account 940881). (Ptf's Ex 1 at 5; Def's Exs J-K.) The real market value on the assessment and tax rolls for the land and buildings and structures, including site developments, is $63,894,470 for the 2012-13 tax year. (Ptf's Compl at 3, 5; Def's Ex J.) Defendant valued the land at $6,601,200 and the buildings and structures at $57,293,270. (*Id.*) The real market value on the rolls for the machinery and equipment is $14,890,570. (Ptf's Compl at 6; Def's Ex K.) Total real market value on the assessment and tax rolls for the 2012-13 tax year, for the land, buildings and structures, and machinery and equipment, is $78,785,040. (Def's Exs J-K.) Again, all property value, except the land, is at issue.

---

[9] While the testimony about Grose's cost estimate under the cited reporting service did indeed narrow the gap between the figures reported by Plaintiff at the time it sought enterprise zone exemption and the values Grose reported having received from Plaintiff when preparing his appraisal, that does not alter the fact that the two "reported" costs differ by approximately $9 million, a fact which draws into question the accuracy or validity of other data Plaintiff's appraisers have presented (because it appears either Plaintiff or its appraiser Grose incorrectly reported at least some relevant data, through mistake, misunderstanding, or otherwise).

Thus, the real market value on the rolls for the property at issue is $72,183,840 ($78,785,040 total RMV - $6,601,200 land RMV), with the machinery and equipment comprising $14,890,570 of that amount and the remaining $57,293,270 ascribed to the buildings and structures. Plaintiff appealed those real market values to the county board of property tax appeals (Board) and the Board sustained the values. (Ptf's Compl at 3.)

In its appeal to this court, Plaintiff has requested a reduction in the real market value of the buildings and structures to $43,123,000,[10] and a reduction in the machinery and equipment to to $8,516,000 (not including personal property).[11] (Ptf's Exs 1 at 50, 2 at 9.)

Defendant has requested that the court uphold the values currently on the assessment and tax rolls. (Def's Answer at 1.)

D.      *The parties' valuation approaches*

1.      *Plaintiff's valuation*

Plaintiff's valuation evidence for the buildings and structures was presented through an appraisal report and the sworn testimony of Grose. Grose, who inspected the property in November 2012, estimated the value of the buildings and structures at $43,120,000, relying primarily on the sales comparison approach, with "minimal emphasis" placed on his cost approach of $53,900,000. (Ptf's Ex 1 at 3, 50.)

Plaintiff presented a value estimate for the machinery and equipment through an appraisal report prepared by Kaufman. (Ptf's Ex 2 at 3, 8, 9.) Kaufman personally inspected the property in August 2013 and arrived at an estimate of value for the machinery and equipment of $8,516,000, attributing $2,690,000 to the racking systems, $5,491,000 to the conveyor and

_____

[10] That is the value estimate conclusion of Plaintiff's appraiser Grose and is only $80,000 higher than the amount requested in the Complaint (which was $43,040,000). (Ptf's Compl for TC-MD 130067C at 1.)

[11] Plaintiff's machinery and equipment valuation is considerably higher than the $750,000 value asserted in the Complaint.

sorting system, and $335,000 to miscellaneous machinery and equipment. (*Id*. at 8, 9.)  Kaufman considered all three approaches to valuation, rejected the income capitalization approach, and placed primary reliance on the "direct comparison (market) approach," using the cost approach "as corroborative evidence." (*Id*. 5.)

           a.      Building and structures

                (1)     Sales comparison approach

For his sales comparison approach, Grose considered the local, regional, and national markets in selecting his comparable sales and ultimately determined that the market for the subject property was national.  (Ptf's Ex 1 at 32.)  Grose selected six sales, which included five fee simple sales and one leased fee sale.  (Ptf's Ex 1 at 39-40.)  None of the six comparable sales are west of the Rocky Mountains; three are located in Georgia, one in Alabama, one in Illinois, and one in Pennsylvania.  (Ptf's Ex 1 at 40.)  Grose's six sales range in size from 810,000 square feet to 1,337,487 square feet.  (*Id*.)  Four of the six sales occurred between February and December 2011, which is the calendar year prior to the January 1, 2012, assessment date for the 2012-13 tax year.  (*Id*.)  The other two are post-assessment date sales, one occurring in July 2012 and the other in August 2012.  (*Id*.)  Unadjusted sale prices range from a low of $6,100,000 to a high of $20,800,000.  (*Id*.)  The value range, on a per foot basis, is between $7.17 per square-foot and $25.74 per square-foot.  The comparable sale properties were built between 1989 and 2007. (*Id*.)  The ceiling heights for the comparable warehouses Grose selected were between 28 feet and 40 feet high.  (*Id*.)  Grose concluded that "the good quality of the building and the limited pool of users/investors for such a large facility in Lebanon supports a fee simple value in the $25-$35/SF range.  A unit value of $30/SF is concluded." (*Id*.)  That $30 per square-foot figure multiplied by Grose's total square footage estimate of 1,437,404 square feet for the buildings and

structures generated a value estimate under the sales comparison approach of $43,120,000

(rounded).  (*Id*.)

The subject was built in 2006-2007 and has a 40-foot ceiling.  (Stip Facts at 1, ¶ 1; Def's

Ex U at 35.)  It is also located in Lebanon, Oregon, several thousand miles from Grose's nearest

comparable sale in Marion, Illinois.  (Ptf's Ex 1 at 15, 40.)  Grose explains in his report that he

made transactional adjustments, where necessary, for things such as differences in property

rights transferred and conditions of sale, and that he *considered* property adjustments as a

quantified percentage "for location and physical characteristics such as size, age, site and parking

ratios, access, exposure, quality and condition, as well as other applicable elements of

comparison."  (*Id*. at 32-33) (emphasis added).)  Grose notes in his report that the property

adjustments described in his narrative and partially enumerated immediately above "are

subjective in nature and are meant to illustrate [his] logic in deriving a value opinion for the

subject property."  (*Id*. at 33.)

(2)     Cost approach

Grose did present a value estimate under the cost approach but, as explained elsewhere in

this Decision, he testified that he ultimately concluded that his estimate under that approach

warranted little or no weight because of difficulties in accurately quantifying items such as

economic obsolescence.  (*See* Ptf's Ex 1 at 31, 48.)  Grose estimated the replacement cost new to

be $65,542,479 ($45.60 per square-foot) and, after making negative adjustments of 13 percent

for physical depreciation and 25 percent for economic obsolescence, arrived at a value for the

buildings themselves of $42,766,468.  (*Id*. at 47-48.)  Gross then added $4,468,750 for the

depreciated value of the site improvements (using 50 percent depreciation) for a total buildings

and structures value estimate of $47,235,218.  (*Id*. at 49.)  Grose states in his appraisal, and

testified at trial, that he accorded the cost approach virtually no weight. (*Id.* at 31, 50.) The court notes that Grose's buildings and structures value estimate under that approach, comes to slightly less than $33 per square-foot, compared to his $30 per square-foot estimate under the comparable sales approach.[12] But, given the fact that Grose himself found the cost approach unreliable, and the court has no way of adequately evaluating the appraiser's estimate of value under that approach, the court gives no weight to Grose's cost approach. That is not to say that the court agrees with Grose that the cost approach should be accorded little or no weight for a relatively new industrial building with considerable cost data available.

(3)     Reconciliation

Grose's reconciliation and conclusion of value for the subject property's buildings and structures is $43,120,000, or $30 per square-foot. (Ptf's Ex 1 at 50.)

b.     Machinery and equipment

Kaufman's appraisal report indicates that "Spearhead conducted an inspection [of the subject property] on August 12, 2013, accompanied by Jennifer Maki of your office and Scott Hering, the Lowe's general manager at the site." (Ptf's Ex 2 at 3.) The appraisal report considered the three standard approaches to valuation (cost, sales comparison, and income capitalization) and arrived at an estimate of value for the subject property machinery and equipment of $8,516,000, as of January 1, 2012, with primary reliance placed on the "Direct Comparison (Market) Approach," and the cost approach "relied upon as corroborative evidence." (*Id.* at 5, 9.)

Kaufman states that his company "conducted interviews with vendors of similar equipment and specifically vendors to Lowe's that supplied equipment to Lowe's[,] particularly

---

[12] $47,235,218 ÷ 1,437,404 square feet = $32.86 per square-foot.

racking and conveyor systems[,] which comprise the majority of the value in this particular appraisal[.]" (*Id*. at 7.)

In describing his market value approach, Kaufman states that "it is rare to find market sales of *identical* units as market research typically only reveals sales of *similar* assets * * * [and] that the subject assets typically sell in bulk[.]" (*Id*. at 5-6 (emphasis added).) Kaufman then notes that "the comparison criteria [he] considered includes age, condition and timing of other bulk sales." (*Id*. at 6.)

Kaufman's cost approach assumed that the subject property machinery and equipment would be removed from its current location, transported to the location of the hypothetical buyer, installed at that location and connected and set up for use. (*Id*. at 6.) Kaufman then made adjustments for physical deterioration, due to aging, and functional and economic obsolescence. (*Id*. at 6-7.) Kaufman determined that the conveyor system, which is the largest and most valuable asset in the subject property warehouse, would cost 44 percent of the original cost as determined by the Kaufman's market research, which resulted in an "opinion of value [of] $5,491,000 for [that system]." (*Id*. at 7.) Kaufman determined that the racking equipment cost "based upon pallet placement" would be "15 to 20 cents on the original dollar each to dismantle, purchase and (re)install like racking for a total range of 45 to 60 cents on the original dollar[,]" resulting in a final "opinion of value [of] $2,690,000 for the [r]acking [equipment]." (*Id*.) Adding a value of $335,000 for miscellaneous machinery and equipment, Kaufman arrived at a final real market value for the subject property's machinery and equipment of $8,516,000, with $2,690,000 ascribed to the racking equipment, $5,491,000 to the conveyor system, and $335,000 to the other machinery and equipment. (*Id*. at 9.)

/ / /

2.    *Defendant's valuation*

Defendant presented a value estimate for the subject building and structures through the photographs, documents, reports, appraisals, and sworn testimony of Johnston and Greene. (Def's Exs O, U.) Johnston presented a value estimate under the cost approach and Greene provided an estimate using both the cost and sales comparison approaches. (Def's Exs O, U at 35-37.) Johnston arrived at a total cost for the subject property under the cost approach of $63,894,500, which included the land value of $6,601,200. (Def's Ex O at 1.)

Greene estimated the value building and structures to be $73,000,000 under the cost approach and $71,700,000 under the sales comparison approach, and, noting that the values under the two approaches were "relatively close," concluded with "[a]n intermediate value [which Greene felt was] most representative of the market value of the subject [property] as of the date of value[.]" (Def's Ex U at 46.) That number is $72,000,000. (*Id*.) Greene's $72,000,000 value estimate includes a value for the land, which, under the cost approach, was determined to be $6,700,000. (Def's Ex U at 37, 44B.)

Defendant's estimate of the real market value of the machinery and equipment was presented through the testimony and supporting appraisal report of Springer after an inspection of the equipment in August 2013. (Def's Ex W at 16.) Springer noted in his appraisal, and during trial, that the primary items of machinery and equipment to be valued were "the racks, conveyors, and support equipment," and that, using "generally accepted appraisal methodologies," arrived at a value for the subject property machinery and equipment as of January 1, 2012, of $13,156,100. (*Id*. at 15, 18.) Springer "placed near exclusive reliance upon the indirect cost approach and minimal reliance on the sales comparison approach to estimate the value of the [subject property machinery and equipment]." (*Id*. at 14.)

a. Buildings and structures

Defendant presented its case regarding the value of the buildings and structures through the testimony of two witnesses, Gene Johnston (Johnston) and Robert Greene (Greene). Johnston testified generally about the subject property, including the fact that it was originally assessed under the Enterprise Zone Exemption program for tax years 2008-09, 2009-10, and 2010-11. He walked the court through numerous photo exhibits depicting the property from the air and from within. (*See* Def's Exs A through I.) Johnston inspected the subject property in August 2013, and testified that he was, overall, very impressed with the cleanliness of the facility and the several miles of conveyors in the building that, in his opinion, were probably specially built. Johnston testified that those conveyors were in "excellent condition."

Johnston testified that for the first year the property was completed and ready for valuation and assessment, he used figures from Marshall valuation services, keeping in mind the reported costs to construct the subject property that he had obtained from a representative from Lowe's. Johnston testified that while the property was under the Enterprise Zone Exemption, he simply applied annual trends and depreciation to the initial cost service valuation estimate.

Johnston testified that he did more work on valuing the property for the 2011-12 tax year because the property was no longer receiving the benefits of the enterprise zone exemption. Johnston testified that he communicated with Bob Meiers (Meiers), Plaintiff's tax manager, primarily by email exchanges, attempting to arrive at a mutually agreeable value for the 2011-12 tax year. (*See* Def's Ex N.) Johnston originally proposed a total value for the subject property for the 2011-12 tax year $82,683,400, using the cost approach. (Def's Ex N at 9.) After communicating with Meiers, primarily through a series of email exchanges, Johnston testified that he reduced the total improvements value by approximately $3,000,000, from $75,923,303 to

$72,494,566. (*See id*. at 6, 9.) Johnston's initial 2011-12 value figures came from a two-page spreadsheet he prepared that was submitted into evidence. (Def's Ex T.) That improvement value includes the value for the warehouse, including the elevator, mezzanine, office space, transportation center, covered canopy area, visitor center, pump house, site developments, and landscaping and fencing, less physical depreciation of three percent and external depreciation of 22 percent, for a value subtotal for the buildings and structures of $56,706,970. (Def's Ex N at 6.) Johnston added a value estimate of $15,787,596 for the machinery and equipment inside the building to arrive at his total 2011-12 tax year improvements value estimate of $72,494,566. (*Id*.)

For the 2012-13 tax year, which is the year at issue, Johnston arrived at a value estimate for the buildings and structures under the cost approach of $57,293,270. (Def's Ex O at 1.) Johnston increased physical depreciation for the 2012-13 tax year from three percent to four percent, and used the same external depreciation of 22 percent for the 2012-13 tax year (the same percentage he used for the 2011-12 tax year). (Def's Exs O at 1, N at 6.)

Johnston testified that the approximately $19 million decrease in real market value for the 2012-13 tax year (comparing his total real market value calculation for the 2012-13 tax year of $63,894,500 to his initial real market value for the 2011-12 tax year of $82,683,400) because the entire state "split out machinery and equipment" from the valuation of a property's buildings and structures beginning in 2012. (*See* Def's Ex N at 9, O at 1.) Johnston's testimony regarding the $19 million value reduction between tax years 2011-12 and 2012-13 is based on his original 2011-12 total property value estimate of $82,683,400, including a 2011-12 land real market value of $6,760,060, compared to his tax year 2012-13 from market value estimate of

/ / /

$63,894,500, comprised of a buildings and structures value of $57,293,270 and a land value of $6,601,200.  (Def's Ex O at 1, T at 1.)

Greene valued the property under the cost and sales comparison approaches.  Greene estimated the value of the property under the cost approach to be $73,000,000 (rounded) (approximately $51 per square-foot), with an unadjusted replacement cost new of $73,915,811, to which he added $14,783,162 (20 percent) for soft costs, to arrive at a total replacement cost new of $88,700,000 (rounded).  (Def's Ex U at 37.)  Greene applied a downward adjustment of 10 percent for physical depreciation and another negative adjustment of 25 percent for external obsolescence, the same percentage used by Grose in his cost approach, for a total depreciation adjustment of slightly more than $31,000,000.  (*Id*.)  That generated a depreciated value of the principal improvements of $57,655,000.  (*Id*.)  Greene then added $8,809,141 for the depreciated value of the site improvements, and $6,700,000 for the value of the land, to arrive at his $73,000,000 (rounded) value estimate under the cost approach.  (*Id*.)  That figure includes an estimated land value of $6,700,000 and $8,809,141 for the depreciated value of the site improvements, leaving the depreciated value of the buildings and structures at $57,655,000.  (*Id*.)

For his sales comparison approach, Greene evaluated seven comparable sales of buildings built between 2002 and 2009, all of which are located in California and sold on a leased fee basis between September 2011 and April 2013.  (Def's Ex U at 39.)  Six of Greene's seven comparable sales were relatively similar in size to the subject property and sold for prices on a per foot basis ranging from a low of $45.59 per square-foot to a high of $86.04 per square-foot. (*Id*.)  After making adjustments for location, age and condition, etc., Greene arrived at a final adjusted value range of between $43.34 per square-foot and $59.62 per square-foot of gross building area including the land. (*Id*. at 44A.)  Greene concluded that two of his comparable

sales were outliers (comps 2 and 7), and when removed, resulted in an average price per square-foot of $52.68. (*Id*. at 45.) Greene notes in his report that "[a]fter consideration of size, age, location, quality of construction, condition, land to building ratio, and other factors affecting value, we estimate that a unit value of $50.00 (GBA of 1,434,685 SF)." (*Id*. at 45.) That resulted in a rounded real market value estimate under the sales comparison approach of $71,700,000. (*Id*.)

Greene concluded that the real market value of the subject property as of January 1, 2012, was $72,000,000. (*Id*. at 46.)

### b. Machinery and equipment

Springer appraised the machinery and equipment for Defendant. (Def's Ex W.) Springer identifies the machinery and equipment appraised as "the racks, conveyors, and support equipment listed in the exhibits to this report." (*Id*. at 5.) Springer's valuation is based on a discussion with Defendant's counsel, management at the Linn County Assessor's office, and operations personnel at Lowe's, as well as a physical inspection and an inventory list provided by Plaintiff. (*Id*. at 6.) Springer notes that machinery and equipment of the nature involved in this case can be valued either under the value in exchange approach or value in use method. (*Id*. at 9.) Springer states in his report that his company was "informed that [] continuation of the current use is anticipated; therefore, fair market value in continued use is the appropriate valuation premise." (*Id*. at 10.) Springer goes on to note "that [Plaintiff] reports that the equipment is operating at design capacity and they are not experiencing any unanticipated operating cost or functionality issues." (*Id*.)

Springer considered the three standard approaches to valuation, rejected the income capitalization approach, "placed near exclusive reliance upon the indirect cost approach[,] and

minimal reliance on the sales comparison approach to estimate the value of the [subject property machinery and equipment]." (*Id*. at 14.) After making various adjustments deemed appropriate to account for physical deterioration, functional obsolescence and external obsolescence, Springer estimates the real market value of the subject machinery and equipment to be $13,156,100 as of January 1, 2012. (*Id*. at 12-13, 16-18.)

Springer concluded that a trended replacement cost new was appropriate, and after considering accepted professional appraisal literature and published sources "such as Marshall Valuation Service and Bulletin F of the Internal Revenue Code, and [his company's] experience with similar assets[,]" Springer concluded that use of a straight-line depreciation method was most appropriate for estimating depreciation. (*Id*. at 16.) Springer notes that" [p]hysical deterioration was considered normal[,]" and that because "a typical large participant such as Lowe's would not purchase a significant portion of their racking on the used market[,] [] we concluded the valuation of the racking and conveyor systems based on the indirect cost approach." (*Id*. at 16.)

In employing the sales comparison approach, Springer sought to "emulate the activity of market participants[,]" and after performing research on asking and selling prices for similar major units in the market, Springer made adjustments "for typical negotiation, warranty, age or other characteristics, as necessary[,] [and] then added [an amount] for installation and soft costs to reflect an installed value prior to consideration of additional obsolescence, if any" (*Id*. at 17.) Springer concluded that after review of various market place offerings and other independent third-party sources, and adjusting for freight and installation, "the indirect cost approach conclusion for these units [was] reasonable." (*Id*.) No dollar amount appears in the appraisal for Springer's sales comparison approach. But, given that Springer gave essentially exclusive

reliance on the cost approach, his $13,156,100 value estimate under that approach appears in the section of his appraisal titled "Summary," and the report indicates that he "considered all generally accepted appraisal methodologies and applied professional appraisal procedures[,]" in arriving at his $13,156,100 estimate. (*Id*. at 17-18.)

## IV. ANALYSIS

A.    *Overview of valuation laws, regulations, and principles*

In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[13]

Real market value is defined in ORS 308.205(1) as follows:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property, although they need not all be developed. Oregon Administrative Rule (OAR) 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of a given property); *see also Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); Appraisal Institute, *The Appraisal of Real Estate* 130 (13th ed 2008). When value is appealed to the court, the approach to be used (or combination of approaches) "is a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979) ("[W]hether in any given assessment one [valuation] approach should be used exclusive of the others or is preferable to

---

[13] All references to the Oregon Revised Statutes (ORS) are to the 2011 edition.

another or to a combination of approaches is a question of fact to be determined by the court upon the record.").

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value on the assessment and tax rolls is incorrect. *See* ORS 305.427. Plaintiff must "establish [its] claim[] by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (Jul 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)).

Burden of proof requires that the party seeking relief, Plaintiff in this case, provide evidence to support its argument. The evidence that a plaintiff provides must be *competent* evidence of the requested real market value of the property in order to sustain the burden of proof. *Poddar v. Dept. of Rev.*, (Poddar), 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)) (emphasis added).

"Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (Mar 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).

"The value of a given property is ultimately a question of fact." *Chart Dev. Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

/ / /

B.    *Areas of agreement*

The parties agree that the highest and best use of the subject property is its current use. (Ptf's Ex 1 at 30; Def's Ex U at 28.)  They also agree on the real market value of the land at $6,601,200, which is the current roll value for the land.  (Stip Facts at 1, ¶ 2.)  Additionally, the parties' experts basically agree on the condition of the property.  Greene characterizes the condition of the subject property improvements as "good, showing evidence of good routine and periodic maintenance and no evidence of deferred maintenance."  (Def's Ex U at 21.)  Grose describes the quality of the structures as "good," and the condition as "good/excellent."  (Ptf's Ex 1 at 22.)  Finally, both Grose and Greene agree in their appraisal reports that under the cost approach no value should be attributed to entrepreneurial profit, and that the replacement cost new for the site improvements should be reduced by 50 percent.  (Ptf's Ex 1 at 49; Def's Ex U at 37.)  However, as is explained more fully below, Grose ultimately relied almost entirely on the sales comparison approach, stating in his report that "the [c]ost approach warranted minimal emphasis in developing my final opinion of market."  (Ptf's Ex 1 at 50.)

C.    *Court's analysis of the evidence*

As indicated above, this case involves the real market value of a large regional distribution warehouse nearly 1.5 million square feet in size with considerable machinery and equipment, including several miles of conveyors and extensive racking systems sitting on approximately 150 acres of land.

At first blush, the parties appear to agree that the two most reliable approaches to valuing the subject property building and structures are the cost approach and the sales comparison approach.  They both include market data for the two approaches.  Of course, Grose and Greene disagree on their respective value estimates under those two approaches.

However, Plaintiff's appraiser Grose testified at trial that he considered the cost approach at the request of his client, but ultimately rejected it as unreliable. That testimony goes slightly farther than the language in Grose's appraisal report, which provides a value estimate under the cost approach, based both on alleged actual costs provided by the client and an estimate based on costs reported by Marshall Valuation Service. Grose states in his appraisal report that "[t]he subject was recently built; however, sales analyzed in developing this appraisal indicate fee simple sales of regional distribution facilities transact at a significant discount below replacement cost. This suggests a high level of obsolescence is typical among this property type. Due to the significant spread between market perceived value and actual cost, *the [c]ost [a]pproach does not provide a reliable value estimate*. However, at the request of the client, this approach was developed and presented." (Ptf's Ex 1 at 31 (emphasis added).) Grose's reconciliation bears that out. In summarizing his value conclusions, Grose states the following in his report: "[b]ased on the overall quality of the data and analyses, and considering the decision-making process of the typical buyer profile of the subject property, the [s]ales [c]omparison approach warranted *primary emphasis* and the [c]ost approach warranted *minimal emphasis* in developing my final opinion of market." (*Id*. at 50 (emphasis added).)

Thus, Plaintiff's real market value estimate for the buildings and structures relies almost solely on the sales comparison approach whereas Defendant valued the property relying primarily on the cost approach (because the 1.43 million square foot distribution warehouse is of relatively recent vintage, having been built in 2006) with the sales comparison approach as a secondary method. The parties spent considerable time during the first two days of trial arguing over the difference between leased fee sales (sales of structures leased by the owner to a third party) and fee simple sales (owner-occupied property sales); each party relied most heavily on

one versus the other, insisting that their comparables (either leased fee or fee simple) were the more appropriate sales.

The court finds it unnecessary to delve into that controversy because of the many problems with Grose's appraisal either brought out by Defendant on cross-examination or identified by the court after trial. The first, and perhaps most significant, problem with Grose's appraisal is that it lacks the data necessary to evaluate the apparently subjective adjustments he made to his comparable sales in arriving at his final estimate of value. That is not to say that Grose's value estimate is necessarily wrong, but only that, standing alone, it is difficult for the court to accept the data presented. Grose's narrative explanation of his value conclusion indicates that his adjusted value range for the six national comparable sales he relied upon support a range of value of between $20 per square-foot and $25 per square-foot for the subject property. Grose then notes that his other two pools of data, involving Oregon sales and "regional West Coast comparables indicate a range of approximately $30-40 after adjustments." (*Id.*) Grose concludes his analysis by stating: "[b]alancing the good quality of the building and the limited pool of users/investors for such a large facility in Lebanon supports a fee simple value in the $25-$35/SF range. A unit value of $30/SF is concluded." (*Id.*)

Based on the testimony adduced on cross examination and the court's review of Grose's report, it appears as though no location adjustments were made by Grose to his national sales, even for his comparable located in Illinois. Additionally, Grose's most comparable national property in terms of size is the warehouse in Commerce, Georgia, which is 1,337,487 square feet in size, but that building was built in 1989, is located on the other side of the country, and sold for $9.53 per square foot whereas Grose estimates the value of the subject property to be $30 per

/ / /

square foot. Grose acknowledged on cross-examination that he made no adjustments for differences in age between his six national comparable sales and the subject property.

There were numerous other problems with Grose's comparable sales brought out by Defendant during cross-examination, but the court finds it unnecessary to chronicle those shortcomings as they were numerous and compelling. By way of example, Grose's comparable 5, located in Pendergrass, Georgia, was admittedly not listed for sale, but rather the buyer approached the seller and Grose acknowledged on cross that he did not talk to either party involved in that transaction. Another example of a concern the court has with Grose's value estimate under the comparable sales approach is that his comparable 6, the sale of a Lowe's distribution center in Palmetto Georgia, involved a bank (REO) sale of a vacant warehouse located near Atlanta, Georgia, and Grose acknowledged during cross that he made no adjustments for the conditions of that transaction. Given these and the numerous other shortcomings with Grose's appraisal report, the court cannot place any weight on Grose's $43,120,000 value conclusion for the subject building and structures.

The court is also troubled by the fact that Grose rejected the cost approach. That approach seems most appropriate in this case because the subject property, and industrial warehouse, with a life expectancy of 50 to 55 years according to the parties' experts, was only five years old on the applicable assessment date of January 1, 2012. Defendant had two appraisers testify, both of whom submitted appraisal reports or data, and both relied on the cost approach. "The cost approach is 'particularly useful in valuing new or nearly new improvements.' " *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citations omitted). " 'In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then

subtracting the amount of depreciation * * * in the structure from all causes.' " *Id.* (citations omitted).

Nonetheless, both parties did present cost approach data and analysis. Plaintiff's value estimate under that approach is $53,900,000 (rounded), or $37.50 per square foot. Defendant's value estimate under the cost approach is $73,000,000, including $6,700,000 (rounded) for the parties' agreed-upon land real market value, a figure that comes to $50.88 per square foot. However, Greene's value estimate for the improvements only under the cost approach is $57,655,000 and Johnston's value under that approach is $57,293,270.

## V. CONCLUSION

After careful consideration of the evidence presented, and bearing in mind the burden of proof and notwithstanding the court's statutory authority to determine the real market value of a property irrespective of the values pled by the parties, the court concludes that the most appropriate methodology for valuing the subject property is the cost approach. On the evidence before it, the court concludes that the current values on the assessment and tax rolls for the 2012-13 tax year should be sustained at $78,785,040, with $57,293,270 allocated to the buildings and structures, $14,890,570 to the machinery and equipment, for a subtotal of $72,183,840, and that the parties' agreement that the real market value of the land should remain unchanged at $6,601,200. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that the real market value for the subject property, identified in the assessor's records as Accounts 169678 and 940881 shall remain unchanged for the 2012-13 tax year.

Dated this ____ day of January 2014.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Dan Robinson on January 30, 2014. The court filed and entered this document on January 30, 2014.*